USAA LIFE INSURANCE COMPANY, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
USAA Life Ins. Co.
Docket No. 18187-88
United States Tax Court
T.C. Memo 1993-18; 1993 Tax Ct. Memo LEXIS 18; 65 T.C.M. (CCH) 1756; January 14, 1993, Filed *18 Decision will be entered under Rule 155. P, an insurance company, was required to maintain a minimum reserve for its universal life insurance policies equal to the cash surrender value of the policies. P complied with this requirement by listing, in its annual statement filed with the State, two separate reserve amounts (8A and 8G reserves) that together equaled the cash surrender value of the policies. The 8A reserve, a life insurance reserve as defined in sec. 801(b), I.R.C., was computed under a preliminary term method and was subject to the revaluation provisions of sec. 818(c), I.R.C.
Held, the 8G reserve represents an amount necessary to satisfy obligations arising under P's insurance contracts as described in section 810(c)(3), I.R.C., and thus is to be considered in computing P's deduction for increased reserves under sec. 809(d)(2), I.R.C.
For Petitioner: Richard Bromley, Glen H. Kanwit, Michael A. Clark, and R. Lee Christie. For Respondent: Avery Cousins, III. NIMS
NIMS
MEMORANDUM OPINION NIMS, Judge: In our original opinion, USAA Life Insurance Co. v. Commissioner, 94 T.C. 499 (1990), revd. without published opinion 937 F.2d 606 (5th Cir. 1991), *19 we held that the total cash surrender value of petitioner's universal life insurance policies represented a life insurance reserve as defined in section 801(b). (Section references are to sections of the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.) We further held that petitioner was not entitled to compute its section 809(d)(2) deduction for increased reserves pursuant to the revaluation formula contained in section 818(c)(2) on the ground that petitioner calculated its life insurance reserves under the net level premium method, as opposed to a preliminary term method. As indicated above, the United States Court of Appeals for the Fifth Circuit reversed our decision in an unpublished opinion. [1]USAA Life Insurance Co. v. Commissioner, revd. without published opinion 937 F.2d 606 (5th Cir. 1991). The Fifth Circuit held that petitioner calculated its reserves under a preliminary term method and that petitioner therefore was entitled to a section 809(d)(2) deduction based on a revaluation of those reserves pursuant to section 818(c)(2). USAA Life Insurance Co. v. *20 Commissioner, id. (Slip op. at 2). The Fifth Circuit remanded the case to this Court for consideration of other issues not initially considered by us as a consequence of our holding on the first issue. The primary issue for decision is whether petitioner is entitled to a further deduction pursuant to sections 809(d)(2) and 810(c) for the portion of petitioner's reserves that are not life insurance reserves under section 801(b). If we find for petitioner on this issue, petitioner will concede the remaining *21 issues. However, if we hold against petitioner, we must decide: (1) Whether petitioner may now correct the computational errors first identified in our original opinion ( USAA Life Insurance Co. v. Commissioner, 94 T.C. at 510-511) and (2) if so, what the correct amounts are. Background
Our original opinion includes detailed findings of fact. Those facts, to the extent they are consistent with the Fifth Circuit's opinion, are incorporated herein by this reference. A summary of the facts relevant to the disposition of this case follows. As in our prior Opinion, we will generally focus on the 1983 year to the extent the parties have stipulated that our holding for 1983 will also apply to 1982. Petitioner, a life insurance company within the meaning of section 801(a), has its principal place of business in San Antonio, Texas. As discussed in more detail below, the issue for decision in this case relates to reserves that the Texas State Board of Insurance required petitioner to maintain with respect to its outstanding universal life policies. Generally, life insurance companies apply one of two methods for determining reserves: the net level reserve *22 method or a preliminary term method. Those two methods are discussed at length in USAA Life Insurance Co. v. Commissioner, 94 T.C. at 504-511. For our purposes, it is important to recognize that historically insurance companies calculating reserves under the net level reserve method enjoyed greater tax benefits than those employing a preliminary term method. Section 818(c), enacted as part of the Life Insurance Company Income Tax Act of 1959, Pub. L. 86-69, 73 Stat. 112, was intended to equalize the tax benefits between the two methods. USAA Life Insurance Co. v. Commissioner, 94 T.C. at 519-520. The effect of section 818(c) is to allow those insurance companies that calculate their life insurance reserves under a preliminary term method to revalue those reserves so as to approximate reserves computed under the net level reserve method. The reserves that an insurance company is required to maintain directly impact the amount of gain or loss the company must report for Federal income tax purposes. Specifically, section 809(d)(2) provides that, in computing its annual gain or loss from operations under section 809(b), *23 a life insurance company may claim a deduction for the net increase in its reserves as determined under section 810. Section 810(b) provides that the deduction for increased reserves referred to in section 809(d)(2) consists of the net annual increase in reserve items described in section 810(c), reduced by the policyholder's share of investment income excluded from the life insurance company's gross income by reason of section 809(a)(1). The items that may be taken into account, as relevant here, are listed in section 810(c) as follows: (c) ITEMS TAKEN INTO ACCOUNT. -- The items referred to in subsections (a) and (b) are as follows: (1) The life insurance reserves (as defined in section 801(b)). * * * (3) The amounts (discounted at the rates of interest assumed by the company) necessary to satisfy the obligations under insurance or annuity contracts (including contracts supplementary thereto), but only if such obligations do not involve (at the time with respect to which the computation is made under this paragraph) life, health, or accident contingencies. (4) Dividend accumulations, and other amounts, held at interest in connection with insurance or annuity contracts *24 (including contracts supplementary thereto). * * *
The term "life insurance reserves" is defined in section 801(b)(1) as those amounts that are: (1) Computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and (2) set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance contracts involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies. Section 801(b)(2) generally provides that in order to qualify as such for tax purposes, life insurance reserves must be those required by law. Section 818(c) provides that life insurance reserves computed on a preliminary term method may be revalued under either an exact revaluation (section 818(c)(1)) or an approximate revaluation (section 818(c)(2)). As previously mentioned, petitioner was required by the Texas State Board of Insurance (the Board) to maintain reserves with respect to its universal life policies. In particular, petitioner was required to maintain a minimum reserve equal to the greater of the aggregate cash surrender value of its universal life policies or a *25 computed reserve. As of the close of the calendar year 1983, petitioner maintained reserves of $ 9,136,718 reflecting the total cash surrender value of its outstanding universal life policies. Petitioner's universal life policies provide that the owner of a policy may surrender all or part of a policy for its cash value at any time before the policy terminates. Termination of a policy occurs: (1) On the first monthly anniversary date after the owner requests termination by written notice, (2) when the insured dies, (3) when a required premium is not received before the end of a grace period, or (4) when the policy matures. Petitioner's universal life policies provide a formula for the monthly calculation of a cash value. Under this formula, greatly simplified, the cash value of a policy on the prior monthly anniversary date would be increased by premiums received and interest credited, and decreased by the cost-of-insurance charge and guaranteed expense charges. Interest was guaranteed to be credited to the cash value at an annual rate of at least 4-1/2 percent, compounded annually. However, the policies allowed petitioner to credit interest in excess of the guaranteed rate, *26 which petitioner did throughout 1982 and 1983. Cost-of-insurance charges were guaranteed not to exceed those based on the 1958 Commissioners Standard Ordinary mortality table. However, the policies allowed petitioner to charge a lesser amount, which it did during 1982 and 1983. Guaranteed expense charges equaled 3 percent of premiums received, plus a $ 50 front-end charge per policy to be assessed in equal monthly amounts over the first 12 months of the policy. Cash surrender value is not determined under either a preliminary term or net level reserve method. Rather, cash surrender value is calculated based on a formula (described above) set forth in the policies in question. During the period in question, the Board required every life insurance company doing business in Texas (including petitioner) to file a year-end annual statement regarding its operations. Minimum aggregate reserves for life insurance policies were required to be listed in exhibit 8, parts A through G, of the annual statement. Petitioner's annual statement for 1983 reflects that petitioner calculated a preliminary term reserve, as of December 31, 1983, by subtracting $ 3,802,632 (an unamortized expense) *27 from $ 9,136,718 (petitioner's cash surrender value approximation of a net level reserve.) Petitioner reported the resulting $ 5,334,086 in exhibit 8, part A (titled "Life Insurance") of its 1983 annual statement, on a line petitioner labeled in part "1958 CSO ALB [Age Last Birthday] 4.5-percent CRVM." Petitioner reported the $ 3,802,632 amount in exhibit 8, part G, line 3 (titled "Miscellaneous Reserves: For surrender values in excess of reserves otherwise required and carried in this schedule.") These amounts will hereinafter be referred to as the 8A reserve and the 8G reserve, respectively. Petitioner reported both the 8A and 8G reserve amounts on Form 1120L, Schedule E, for purposes of reporting its Federal income tax liability for the taxable year 1983. In addition, petitioner revalued its preliminary term reserve under the approximate revaluation formula of section 818(c)(2)(A). The resulting revaluation amount of $ 11,443,587 was also reported on petitioner's Schedule E. Discussion
The Fifth Circuit held that petitioner calculated its life insurance reserves based on a preliminary term method, and that petitioner therefore was entitled to revalue those reserves under *28 section 818(c)(2)(A). USAA Life Insurance Co. v. Commissioner, 937 F.2d 606 (5th Cir. 1991) (Slip op. at 12-14). In short, the Fifth Circuit sustained petitioner's reporting position respecting both the 8A reserve figure and the revaluation amount. We now are confronted with the question of whether petitioner is entitled to include the 8G reserve amount in the computation of its increased reserves pursuant to sections 809(d)(2) and 810(c). As indicated, the 8G reserve amount derived from petitioner's calculation of a preliminary term reserve. Petitioner calculated an unamortized expense allowance which it subtracted from the aggregate cash surrender value of its universal life policies (an approximation of a net level reserve) to arrive at its preliminary term or 8A reserve. Petitioner then computed its 8G reserve as the excess of its aggregate reserves for cash surrender value over its preliminary term reserve amount. To the extent that the 8G reserve represents a portion of petitioner's aggregate reserves for cash surrender value, we must focus on the latter amount in determining whether the 8G reserve qualifies as an item described in section *29 810(c). The Fifth Circuit observed that petitioner did not calculate the cash surrender value of its universal life policies on the basis of mortality factors or assumed interest rates. USAA Life Insurance Co. v. Commissioner, 937 F.2d 606 (5th Cir. 1991) (Slip op. at 14). In this regard, it necessarily follows that the 8G reserve is not a life insurance reserve as defined in section 801(b) and does not qualify as an item described in section 810(c)(1). Petitioner asserts that the 8G reserve is to be taken into account in calculating its increased reserves as an item described under either section 810(c)(3) or (4). Section 810(c)(3) provides in pertinent part: (c) ITEMS TAKEN INTO ACCOUNT. -- The items referred to in subsections (a) and (b) are as follows: * * * (3) The amounts (discounted at the rates of interest assumed by the company) necessary to satisfy the obligations under insurance or annuity contracts (including contracts supplementary thereto), but only if such obligations do not involve (at the time with respect to which the computation is made under this paragraph) life, health, or accident contingencies.
Respondent contends *30 that the 8G reserve does not qualify for deduction under section 810(c)(3) on the ground that subsection (c)(3) only applies to obligations that are calculated on a discounted basis. Respondent maintains that petitioner should not now be permitted to argue that the cash surrender value of its universal life policies represents a discounted obligation for purposes of section 810(c)(3) when petitioner previously argued that the reserve was not calculated on the basis of assumed rates of return (to avoid having the 8G reserve characterized as a section 801(b)(1)(A) life insurance reserve). We disagree with respondent's contention that section 810(c)(3) only applies to amounts set aside to satisfy obligations that are calculated on the basis of an assumed rate of return. We find no support for respondent's interpretation of the provision in either the plain language of the statute or its legislative history. Respondent relies on the parenthetical language contained in section 810(c)(3) which provides that the amount taken into consideration under that subsection must be "discounted at the rates of interest assumed by the company". In our view, the parenthetical language relied upon *31 by respondent merely provides that the amount to be taken into consideration shall be reduced to present value if the company assumed a return in computing the amount of that particular obligation in the first instance. In other words, the parenthetical language of section 810(c)(3) is properly viewed simply as a device to ensure that the amount taken into consideration thereunder is not overstated. Consequently, to the extent the 8G reserve amount represents the precise amount set aside by petitioner to satisfy its reserve requirements, the parenthetical language in question provides no basis for excluding that item from inclusion under section 810(c)(3). Respondent also contends that section 810(c)(3) was not meant to apply to the 8G reserve in that "typically, the items in this category consist of certain reserves with respect to supplementary contracts not involving life contingencies." In support of this contention, respondent directs the Court's attention to Exhibit 10 of the annual statement entitled "SUPPLEMENTARY CONTRACTS WITHOUT LIFE CONTINGENCIES, DIVIDEND ACCUMULATIONS, AND COUPON ACCUMULATIONS." Respondent argues that because the 8G amount does not relate to supplementary *32 contracts, section 810(c)(3) does not apply to those reserves. We disagree. Section 810(c)(3) expressly applies to "The amounts * * * necessary to satisfy the obligations under insurance or annuity contracts (including contracts supplementary thereto)". (Emphasis added.) The plain language of the provision indicates that amounts taken into consideration thereunder include those necessary to satisfy obligations under insurance or annuity contracts or contracts supplementary thereto. Thus, so long as it can be said that the 8G reserve amount relates to an obligation arising under an insurance contract (which it does) or under a contract supplementary thereto, the reserve may be treated as an item described in section 810(c)(3) if it satisfies the other requirements of that section. Respondent next argues that the 8G reserve amount does not qualify as an item under section 810(c)(3) on the ground that cash surrender value represents an obligation that is subject to a "life contingency". The term "life contingency" is not explicitly defined in the code, regulations, or legislative history underlying the provisions in question. Nor have the parties directed us to a concise definition *33 of the term. We can, however, derive some guidance from the legislative history surrounding the enactment of section 801(b)(1) regarding the definition of life insurance reserves. Prior to 1942, the term "life insurance reserve" was not defined in the Internal Revenue Code. However, the Supreme Court, in Maryland Casualty Co. v. United States, 251 U.S. 342, 350 (1920), had defined the term "reserve" as: a sum of money, variously computed or estimated, which with accretions from interest, is set aside, "reserved," as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment. [Emphasis added.]
The Revenue Act of 1942, ch. 619, tit. I, sec. 163(a), 56 Stat. 798, 867-868, included new section 201(c)(2) (a predecessor to section 801(b)) of the 1939 Code which provided the first statutory definition of the term "life insurance reserve". At that time, Congress resolved to eliminate the requirement that such reserves relate solely to contingent claims and instead adopted an approach *34 requiring that such reserves relate to claims "involving * * * life, health or accident contingencies". Sec. 801(b)(1)(B). As explained by the Senate Finance Committee: The elimination of contingent claims from the House bill is to permit the liability arising from insurance contracts providing for the payment of the proceeds in installments certain for a specified period and a continuation of their installment payments to a beneficiary so long as he might live, to be classified as a reserve if the contract involved a life contingency even if some part of the liability was held to meet noncontingent claims * * *. [S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 612.]
In short, the language permits a reserve set aside for an annuity certain and then for life to qualify as a life insurance reserve notwithstanding that the annuity certain portion of the obligation is definite and ascertainable and, therefore, is not subject to a life contingency. Consistent with the foregoing, it follows that obligations that can be determined with certainty and without regard to the life expectancy of the payee do not involve life contingencies. *35 Given the Fifth Circuit's statement in the instant case that petitioner did not calculate the cash surrender value of its universal life policies on the basis of mortality factors or assumed interest rates, we hold that the 8G reserve amount relates to an obligation that does not involve a life contingency. The 8G reserve amount is determinable with certainty: it is the amount determined under a formula known as a cash surrender value formula. Respondent argues that the cash surrender value is subject to a life contingency because the insured must be alive in order for the policyholder to claim cash surrender value. In our Opinion, USAA Life Insurance Co. v. Commissioner, 94 T.C. at 536-537, we concluded that cash surrender value represents a future unaccrued claim subject to a life contingency. On further reflection, however, and in light of the Fifth Circuit's holding, we are not now prepared to define the term so broadly. If we were to do so, it would follow that all obligations arising under a life insurance policy would be considered subject to a life contingency. Moreover, it is evidence from the statements contained in the Senate Finance *36 Committee report that Congress did not contemplate such an expansive definition of the term. We accordingly conclude that the 8G reserve is the amount that State regulatory authorities required petitioner to maintain (in addition to the reserve computed under a preliminary term method (8A reserve)) to ensure that petitioner was in a position to satisfy contractual obligations arising under its universal life policies. The Fifth Circuit indicated that this reserve is not a life insurance reserve. USAA Life Insurance Co. v. Commissioner, 937 F.2d 606 (5th Cir. 1991) (Slip op. at 14). The cash surrender value simply is the amount a policyholder will receive upon surrender of the policy. Thus, it is an amount necessary to satisfy petitioner's obligation under its insurance contracts and reflects an item that may be taken into consideration pursuant to section 810(c)(3). In light of our holding that the 8G reserve qualifies as an item to be taken into consideration under section 810(c)(3), we need not address petitioner's alternative contention that the 8G reserve also qualifies as an item described in section 810(c)(4). Respondent argues that even *37 if we find that the 8G reserve qualifies as an item described in section 810(c)(3), petitioner is prohibited from considering that amount in computing its increased reserves for the years in dispute as a consequence of the flush language of section 810(c) which provides: In applying this subsection, the same item shall be counted only once.
Respondent maintains that the total reserve petitioner actually was required to set aside for the cash surrender value of its universal life policies ($ 9,136,718) has been accounted for to the extent petitioner's increased reserves computation already includes both the 8A reserve amount ($ 5,334,086) and the amount reflecting the approximate revaluation of its preliminary term reserve ($ 11,443,587). In respondent's view, a further deduction with respect to the 8G amount will produce a double deduction -- an outcome prohibited under section 810(c). We disagree. Respondent does not argue that petitioner has actually deducted the 8G amount previously under section 810(c). Rather, the crux of respondent's argument is that by virtue of the revaluation afforded under section 818(c)(2), petitioner's increased reserve computation already reflects *38 an amount exceeding the cash surrender value of its policies. The flush language of section 810(c) states that "the same item shall be counted only once." As we understand the provision, it operates to prohibit the manipulation of the definitions in that section to obtain a double deduction. Thus, the flush language of section 810(c) would prohibit identical deductions in a situation where the amount in question may fit into more than one of the items described therein. It follows from the Fifth Circuit's opinion in this case that the 8A reserve alone is a life insurance reserve. Thus, that amount is properly taken into consideration in the section 809(d)(2) computation (independent of the 8G reserve) as an item described in section 810(c)(1). As a consequence of the Fifth Circuit's holding, it also follows that petitioner is entitled to revalue its preliminary term reserve under section 818(c)(2). Even though the sum of these two amounts exceeds the aggregate reserve for cash surrender value that petitioner was required to maintain, we see no support in the controlling statutory provisions for the propositions: (1) That the 8G reserve is to be treated as if already taken into *39 account under section 810(c), or (2) that the flush language of section 810(c) precludes consideration of the 8G reserve amount as an item described in section 810(c)(3). As a consequence of our holding that the 8G reserve qualifies as an item described in section 810(c)(3) and may be taken into consideration in calculating petitioner's increased reserves under section 809(d)(2), petitioner concedes that it erred in computing the 8A and 8G reserve amounts and that respondent's proposed recomputation of the two reserves is correct. Consistent with petitioner's concessions, the correct amounts of the 8A and 8G reserves are $ 3,755,000, and $ 5,381,718, respectively. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. With regard to unpublished opinions of the Fifth Circuit, Rule 47.5.3, Fed. Local Ct. Rules, 5th Cir., provides in part as follows: 47.5.3 Unpublished Opinions. Unpublished opinions are precedent. However, because every opinion believed to have precedential value is published, an unpublished opinion should normally be cited only when it (1) establishes the law of the case↩, (2) is relied upon as a basis for res judicata or collateral estoppel, or (3) involves related facts. [Emphasis added.]